# In the United States Court of Federal Claims

No. 14-301C

(Filed Under Seal: November 13, 2014)

(Reissued for Publication: November 25, 2014)[1]

```
**************************************
                                   *
FIRSTLINE TRANSPORTATION           *
SECURITY, INC.,                    *
                                   *
                Plaintiff,         *      Post-Award  Bid  Protest;  TSA
v.                                 *      Procurement for Airport Security
                                   *      Services; Challenges to Agency's
THE UNITED STATES,                 *      Evaluation After Remand; Analysis
                                   *      of  Disparate  Offerors  With
                Defendant.         *      Identical  Non-Price  Ratings;
and                                *      Degree of Agency Discretion in
                                   *      Best Value Procurements.
AKAL SECURITY INC.,                *
                                   *
                Defendant-Intervenor. *
**************************************
```

*Bradley D. Wine*, with whom were *Pablo A. Nichols*, and *Catherine L. Chapple*, Morrison & Foerster LLP, McLean, Virginia for Plaintiff.

*William J. Grimaldi*, Trial Attorney, with whom were *Stuart F. Delery*, Assistant Attorney General, *Robert E. Kirschman, Jr.,* Director, and *Bryant G. Snee*, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., *Peter Jones* and *Michael Kiffney*, Office of Chief Counsel, Transportation Safety Administration, Of Counsel, for Defendant.

*Terrence M. O'Connor*, with whom were *Seth C. Berenzweig*, *Stephanie D. Wilson*, *Kathryn M. Lipp*, *John W. Polk*, and *Frank Gulino*, Berenzweig Leonard LLP, McLean, Virginia for Intervenor.

---

[1] The Court issued this opinion under seal on November 13, 2014 and gave the parties until November 20, 2014, to submit any proposed redactions of competition-sensitive, proprietary, confidential, or other protected information. The Court conducted a hearing by telephone on November 25, 2014 to discuss the proposed redactions. As agreed by counsel for the parties, the Court accepted some of the proposed redactions, which are indicated in the opinion by [* * *].

OPINION AND ORDER

WHEELER, Judge.

This post-award bid protest has a long history at the Court as this case represents the third challenge brought by Plaintiff FirstLine Transportation Security, Inc. ("FirstLine") for a contract to perform security screening services under the Transportation Security Administration's ("TSA's") Screening Partnership Program ("SPP") at Kansas City, Missouri International Airport ("MCI").[2]

FirstLine brought its first challenge to the award of the MCI contract on June 10, 2011.  See FirstLine Transp. Sec., Inc. v. United States, 100 Fed. Cl. 359, 362 (2011) (Bush, J.) ("FirstLine I").  Judge Bush sustained the protest and prevented TSA from proceeding with its proposed contract award.  See id. at 401 (enjoining "performance of the contract by Akal and direct[ing] TSA to amend or cancel the RFP").  Following FirstLine's successful challenge, TSA decided to conduct a complete reprocurement for the MCI contract on July 23, 2012.  Administrative Record ("AR") Tab 1 at 1.  FirstLine then brought a pre-award protest to this Court challenging the solicitation's terms.  See FirstLine Transp. Sec., Inc. v. United States, 107 Fed. Cl. 189, 193 (2012) (Wheeler, J.) ("FirstLine II").  Although the Court denied that protest, TSA followed the Court's recommendation and amended the solicitation to remove an ambiguity regarding the 40 percent small business participation goal.  Id. at 211-12; AR Tab 2 at 275.  After TSA amended the solicitation, it went ahead with the procurement and evaluation of proposals, which resulted in award of the MCI contract to Akal Security, Inc. ("Akal").

Following award of the MCI contract to Akal, FirstLine brought the current challenge, arguing that TSA lacked a rational basis for its award decision and requesting the Court to permanently enjoin TSA from proceeding with the performance of the contract.  See Pl.'s Sealed Mot. for J. Remand Admin. R. at 1, Dkt. No. 90 ("Pl.'s Remand MJAR").  It also requested the Court to vacate TSA's award decision and award the contract to the next-in-line offeror or to require TSA to solicit revised proposals and conduct an evaluation and award decision consistent with the solicitation's terms.  See id.

On June 12, 2014, the Court remanded the case to TSA because the Administrative Record ("AR") lacked sufficient information to evaluate the agency's

---

[2] The facts in this decision are taken from the administrative record.  The pages in the administrative record are numbered in sequence, and the documents are divided by tabs.  The Court's citations to the administrative record generally are to the page numbers, except that large documents are referenced by the tab number.

actions.  See Remand Order, Dkt. No. 77.  TSA responded to the Court's inquiries, and the parties then filed cross-motions for judgment on the remand administrative record, as well as response and reply briefs.[3]  The Court heard oral argument on the motions on September 24, 2014.

In considering the entire record, including the remand record, the Court finds that the award decision to Akal should stand.  The remand record adequately addressed the Court's concerns regarding TSA's evaluation of the offerors' proposals.  As will be explained, and although TSA's process has been far from a model procurement, the Court finds TSA was not "arbitrary or capricious" when it awarded the MCI contract to Akal.  Specifically, TSA had a reasonable basis when it evaluated the risk to contract performance with Akal's proposed screening hours, planned [* * *] percent employee retention rate, and low award fee.  These risk analyses justified the identical evaluation ratings given to both FirstLine and Akal.  Finally, because the Supervisory Transportation Security Officer ("STSO") screening hours are roughly in line with the Government's estimate, Akal's temporary promotions plan did not violate the Standard Operating Procedures ("SOPs").  The Court's detailed bases for these conclusions are explained below.

<u>Factual and Procedural Background</u>

In 2001, Congress passed the Aviation and Transportation Security Act ("ATSA").  Pl.'s Compl. ¶ 11, Dkt. No. 1.  The ATSA created TSA and directed the agency to "establish pilot projects where screening would be performed by employees of qualified private companies under federal oversight."  Id.  Following two years of a successful pilot program, TSA introduced its SPP.  Id. ¶ 12.  Under the SPP, TSA contracts with private companies to provide passenger and baggage security screening services at certain designated airports, including MCI in Kansas City.  See FirstLine I, 100 Fed. Cl. at 362-63.  FirstLine has been the incumbent contractor at MCI since the inception of the pilot program in Fall 2002.  Pl.'s Compl., ¶¶ 13, 18.  TSA awarded the company's most recent contract in 2006, for one base year plus four option years.  Id. ¶ 18, n.6.  That contract expired on September 30, 2010.  Id. ¶ 13. Since then, FirstLine has performed security screening services at MCI under multiple short-term bridge contracts.  Id.  The MCI contract is FirstLine's largest and currently accounts for [* * *] percent of the company's revenue.  Id.

---

[3] Akal Security, Inc. ("Akal"), as the intervenor in this matter, also filed a motion for judgment on the remand administrative record and submitted briefs accordingly.

I.       The Decision in *FirstLine I*

On April 2, 2010, "in anticipation of the expiration of FirstLine's contract," TSA issued the first solicitation for screening services at MCI.  See FirstLine II, 107 Fed. Cl. at 194.  After the first solicitation resulted in an award of the MCI contract to Akal, FirstLine protested the award to the United States Government Accountability Office ("GAO") and then to this Court.  Id.  Judge Bush sustained the protest and gave TSA two options: amend the solicitation to correct the errors in the price evaluation scheme, or conduct a complete reprocurement.  Id.

II.      The Current Solicitation and *FirstLine II*

TSA opted to conduct a complete reprocurement and issued a second solicitation (RFP No. HSTS05-12-R-SPP038) for the MCI contract on July 23, 2012.  AR Tab 1 at 1. The agency requested offerors to submit their proposals by September 6, 2012.  Id.  "Like its predecessor, the new solicitation called for the award of a single fixed-price award-fee contract, consisting of one base year and four one-year option periods, to be awarded on a best value basis according to specified evaluation factors."  FirstLine II, 107 Fed. Cl. at 195; see also AR Tab 1 at 125, 139.

On September 14, 2012, FirstLine challenged the terms of the new solicitation in a pre-award bid protest brought to the Court.  See FirstLine II, 107 Fed. Cl. at 195.  Though the Court denied the protest, TSA followed the Court's recommendation in that opinion and amended the solicitation to remove an ambiguity in the Request for Proposals ("RFP").  Id. at 211-12; AR Tab 2 at 275.

A.       The Current Solicitation's Requirements

Following the Court's decision in FirstLine II, FirstLine and Akal, among others, submitted timely proposals for the MCI contract on March 4, 2013.  See Pl.'s Compl. ¶ 50; AR Tabs 6, 7.  TSA then evaluated each proposal using the following factors: (1) cost efficiency; (2) operational screening management; (3) program management; (4) logistics and training; (5) transition; (6) past performance; and (7) price.  AR Tab 2 at 277.  Factor 1: Cost Efficiency was the most important evaluation factor.  AR 278 (excluding price). Factors 2-6 descended in importance, except that factors four and five were of equal significance.  See id.  Factor 1 and Factor 7 (the "price" factors) were evaluated separately from the non-price (or "technical") factors.  AR 277.  In terms of overall importance, Factors 2-6, when combined, were approximately equal to price (Factor 7). AR 278.

4

The most important technical factor, Factor 2: Operational Screening Management, required an offeror to "describe[] and detail[] how it intends to schedule the work at passenger and baggage screening areas, and for the routine execution of layered security activities, in a manner consistent with airport hours of operation and information provided in the solicitation." AR 269, 278. At a minimum, an offeror's plan should include hours of operation and manning, response to seasonal variation, and any shift flexibility. Id. The plan must provide a staffing approach "that ensures that staffing levels are consistent" with its operational schedule. Id. Further, the plan should include a narrative supporting the rationale for the staffing amounts for each category and an approach to comply with the Quality Assurance Surveillance Plan's ("QASP's") performance measures. AR 270; AR Tab 1 at 35-53, 203-04. Finally, the solicitation required the offeror to complete the J.16 Staffing Plan template. AR Tab 2 at 269 ("The Contractor shall use the template located in Attachment J.16"). TSA also provided a history of estimated productive hours to serve "as background and [ ] not [as] a Government requirement." AR Tab 2 at 257-58.

The Statement of Work ("SOW") instructed offerors to provide security screening services in accordance with the SOPs and Operational Directives ("ODs"). AR Tab 1 at 12-13. These services included screening persons and baggage entering and inside the airport's sterile area, checking travel documents, maintaining screening equipment, managing screening workforce, and providing temporary screening for pilots and surge requirements. AR 13. As part of each employee's training, an offeror must provide a detailed review of the SOPs. AR 16. "No employee shall be assigned to screening duties unless he/she is thoroughly knowledgeable of the SOPs and is certified by the contractor in accordance with TSA standards . . . ." Id. The SOW required STSOs to maintain a SECRET security clearance. AR 31.

TSA's Pre-Solicitation Notice informed offerors that access to the SOPs would be granted if they met the bid submission prerequisites. Decl. of Stephen P. Metzler ¶¶ 5-6, Dkt. No. 50-2 ("Metzler Decl."). Once an offeror passed the mandatory Security Threat Assessment, it gained access to the SOPs and permission to submit a proposal. Id.; Ex. 2A at 2. The SOPs listed each position's duties and staffing requirements. AR Tab 25 at 1675-80. Specifically, the contractor must designate [* * *] Transportation Security Officer ("TSO") as Lead Transportation Security Officer ("LTSO") for every [* * *] screening lanes and each screening checkpoint must include at least [* * *] STSO. Id. at 1675. FirstLine complied with the guidelines to obtain access to the SOPs, but Akal did not and submitted its proposal without reviewing the SOPs. Pl.'s MJAR at 2; Metzler Decl. ¶¶ 4-8; Akal's Mem. in Supp. of its Mot. for J. on the Admin. R. at 19, n.8, Dkt. No. 40.

5

B.    The Evaluation Teams and the Source Selection Evaluation Board's Findings

Three evaluation teams assessed each proposal.  The Technical Evaluation Team ("TET") assigned each offeror adjectival ratings (Outstanding, Good, Acceptable, and Unacceptable) for factors two through five.  AR Tab 19 at 1520.  These adjectival ratings required a risk assessment.  AR Tab 4 at 327-28.  A rating of "Outstanding" meant that "[a]ny identified risks are minor and can be mitigated with minor to no Government intervention," whereas "Unacceptable" meant "unacceptable contract risk."  Id. Proposals received higher ratings on factor two if they surpassed the SOW's minimum requirements while providing benefits to the agency, reducing risk, or arranging for speedy implementation upon award.  AR Tab 2 at 279.  The TET also created a forty-five page consensus report describing the strengths and weaknesses of the initial proposals. AR Tab 12.  This analysis required further risk assessment: a weakness is "a flaw in the proposal that increases the risk of unsuccessful contract performance," and a risk is "a proposal element or approach that has the potential to cause a disruption of schedule, an increase in program cost or a degradation of performance."  AR Tab 4 at 329.

The Past Performance Evaluation Team ("PPET") assigned adjectival ratings to factor six (Acceptable, Neutral, Unacceptable) and produced an initial consensus report, while the Price Evaluation Team ("PET") analyzed the price factors in its initial report. AR Tab 4 at 328; AR Tab 10; AR Tab 11.  The most important factor, Cost Efficiency, required that an offeror's total proposed price be equal to or lower than the Federal Cost Estimate ($140,962,841.47) and be balanced to receive an "Acceptable" rating.  AR Tab 2 at 278-79.  An "Unacceptable" Cost Efficiency rating would render the entire proposal "Unacceptable."  AR 279.

Following the initial reports, TSA eliminated one offeror considered to be nonresponsive to the solicitation and conducted discussions with the seven remaining offerors in the initial competitive range.  AR Tab 20 at 1605.  Ultimately, five offerors submitted final revised proposals ("FRPs").  Id. at 1607.  The TET, PPET, and PET examined the FRPs and provided consensus reports.  Id.

The Source Selection Evaluation Board ("SSEB") reviewed the TET, PPET, and PET reports and provided additional analysis in its 85-page report "Trade-Off Analysis and Award Recommendation."  AR Tab 19.  Findings for FirstLine and Akal are as follows, including FirstLine's higher factor four rating of "Good":

|  | **FirstLine** | **Akal** |
|---|---|---|
| **Factor 1: Cost Efficiency** | Acceptable | Acceptable |
| **Factor 2: Operational Screening Management** | Outstanding | Outstanding |
| **Factor 3: Program Management** | Good | Good |
| **Factor 4: Logistics and Training** | Good | Good |
| **Factor 5: Transition** | Good | Good |
| **Factor 6: Past Performance** | Acceptable | Acceptable |
| **Factor 7: Price** | [* * *] | $108,878,523.97 |

AR 1520; AR Tab 12 at 884 (FirstLine received a rating of "Acceptable" for Factor 4 in the initial evaluation of proposals). In performing a trade-off analysis between FirstLine and Akal, the SSEB identified the offerors' strengths and weaknesses for each evaluation factor. AR Tab 19 at 1532-39. The SSEB identified five strengths in FirstLine's proposal and six strengths in Akal's proposal for factor two, one strength and one significant strength in both proposals for factor three, one strength in FirstLine's proposal and two strengths in Akal's proposal for factor four, and three strengths in both proposals for factor five. Id. at 1533-38. The SSEB identified no weaknesses in either proposal and determined that "both offer superior technical proposals that mitigate risk in terms of screening performance." AR 1539. Considering all seven factors together, the SSEB concluded that Akal's proposal provided the best value to the Government and thus was superior to FirstLine's proposal. Id.

C.    The Source Selection Authority's Findings and Award Decision

The Source Selection Authority ("SSA") considered the SSEB's findings and conducted his own investigation, as documented in the SSA decision memorandum. AR Tab 20. Initially concerned with the variance between FirstLine's and Akal's proposed prices, the SSA examined both screening labor staffing plans and found that Akal's proposal was advantageous for two reasons: (1) it offered flexibility in coordinating schedules for checkpoints to meet airline schedules, and (2) it reduced the overall price. AR 1610-12. Further, the SSA noted that the TET and PET raised no concerns regarding the total number of hours Akal proposed even though it was [* * *] percent fewer hours

than the Government's estimate.  AR 1612; Decl. of Jimmy J. Jackson ¶¶ 10-11, Dkt. No. 1-1 ("Jackson Decl.") (stating the "SSA focused upon the difference of Akal's *Total* Hours and not upon the difference in Akal's *Screening* Hours which is the service actually being procured").  Though Akal relied more heavily on part-time employees than FirstLine to reduce costs, the SSA determined that Akal's proposed labor hours complied with the SOPs.  AR Tab 20 at 1612-13.  The SSA based this determination on the TET and SSEB analyses and not on a separate independent analysis.  Id.

Akal's award fee also caused the SSA concern and at first, he believed it to be a mistake.  AR 1613.  FirstLine proposed an award fee of [* * *] and Akal proposed a fee of [* * *] amounting to an award fee of only [* * *] percent.  Id.  Akal's [* * *] percent award fee was [* * *] less than FirstLine's fee.  Id.  After verifying that the low award fee was consistent with past Akal proposals, the SSA found that the fee was acceptable and presented significant savings.  Id.

Reviewing factors two through six, the SSA determined that "neither Akal nor FirstLine distinguished itself technically to a point that [he] could conclusively determine [that] one is the technically superior offeror."  AR 1616.  Thus, because the proposals were "technically equal," and price was of equal importance to the technical factors, the SSA, like the SSEB, concluded that Akal's proposal offered the best value to the Government and recommended that TSA award the MCI contract to Akal.  Id.

On February 25, 2014, FirstLine learned that TSA again selected Akal as the awardee.  AR Tab 21.  Following a post-award debriefing and a protest to the GAO, FirstLine brought this challenge to the Court on April 15, 2014.  See Pl.'s Compl., ¶¶ 1, 116.  In its protest, FirstLine alleged that TSA made "several prejudicial errors" requiring the Court to vacate the award to Akal and direct TSA to conduct a new evaluation.  See Pl.'s Compl. ¶ 4.

The parties submitted cross-motions for judgment on the administrative record. See Def.'s Mot. for J. on the Admin. R., Dkt. No. 42 ("Def.'s MJAR"); Pl.'s MJAR, Dkt. No. 50.  On June 10, 2014, the Court held oral argument to decide the cross-motions for judgment on the administrative record.  After the Court heard the argument, the Court decided that the administrative record lacked sufficient evidence to evaluate whether TSA's actions had a rational basis and accordingly, remanded the matter to TSA for additional review, findings, and explanation.  See Remand Order at 1.

III.    The June 12, 2014 Remand Order and TSA's Response

In the Remand Order to TSA, the Court asked the agency to review and document six areas of inquiry: (1) the agency's rationale for giving FirstLine and Akal identical

ratings on the solicitation's non-price evaluation factors; (2) whether Akal's low award fee presents any risk to the agency regarding Akal's motivation to achieve superior contract performance; (3) whether Akal's claimed ability to retain [* * *] percent of the existing workforce presents any risk to the agency in maintaining an experienced staff of employees; (4) whether Akal's proposal conforms to the requirements of a fixed price proposal; (5) whether the agency considers Akal's proposed screening hours unreasonably low and whether these hours present any risk to the agency regarding Akal's ability to perform the contract successfully; and (6) whether Akal's proposed use of temporary promotions meets all the requirements in the solicitation, the SOPs, and the ATSA. See id. at 2-3.

TSA provided its response to the Remand Order on July 28, 2014.[4]  Each response to the Court's inquiries is detailed below.

In the remand response, the SSA first evaluated why both Akal and FirstLine received identical ratings on the non-price evaluation factors, noting that initially, each proposal is independently evaluated taking into account significant strengths, significant weaknesses, strengths, weaknesses, deficiencies and risks. AR Tab 41 at 2300. The non-price evaluation ratings do not represent a comparison of the proposals. Id. Instead, after evaluation, one of four possible ratings is assigned for each non-price factor – Outstanding, Good, Acceptable, or Unacceptable. Id. Thus, it is possible for two offerors to receive identical ratings on the non-price evaluation factors. See id.

As to the second area of inquiry on remand, the SSA explained that the Price Evaluation Team ("PET") reviewed Akal's proposed award fee and found it did not present any risk. AR 2301. The SSA noted three factors mitigating risk: (1) the proposed employee incentive program; (2) award fees at other SPP airports; and (3) the impact of competition among offerors. Id. In addressing Akal's employee retention plan, the SSA expressed confidence that Akal "provided a low risk solution for retaining the existing workforce." AR 2302. Akal proposed several creative mitigation strategies including its flexible compensation package. Id.

As with Akal's award fee, the SSA also found no performance risk with Akal's proposed number of productive hours. AR 2304. The total number of productive hours Akal proposed was only [* * *] percent lower than the Government's estimate in the

---

[4] The Court requested and TSA addressed Akal's offer of a fixed-price proposal. See Remand Order at 2; AR Tab 41 at 2303. FirstLine, however, did not challenge Akal's fixed-price proposal in its remand motion for judgment on the administrative record and thus, it is no longer at issue. See Pl.'s Mot. for J. on the Remand Admin. R. at 8, n.6, Dkt. No. 90.

Staffing Allocation Model ("SAM").  Id.  On remand, the TET also specified several strengths in Akal's proposal, which contributed to its finding of no performance risk.  AR Tab 42 at 2311-14.  First, the increase in number of part-time employees would provide Akal with more flexibility in staffing during peak and non-peak periods.  AR 2312.  Second, the TET found that Akal's Queue Management System ("QMS") which includes [* * *] would "likely result in staffing efficiencies, thereby allowing Akal additional flexibility."  AR 2313.  Finally, the Operational Dashboard[5] would consistently ensure adequate staffing during all operational hours.  AR 2313-14.

Moreover, the SSA found that FirstLine historically over-estimated the total number of hours in its proposals when compared to the actual number of productive hours invoiced for the security screening services at MCI.  AR Tab 41 at 2305.  When compared to FirstLine's actual productive hours, Akal actually proposed more hours.  Based on this comparison, the SSA concluded that Akal's proposal presented low or no risk to the Government.  Id.

Analysis of productive hours was not directly responsive to the Court's request in the Remand Order, however.  Accordingly, TSA also included "Akal's screening hours for analysis."  See AR Tab 42 at 2314.  Screening hours are "time spent at the passenger checkpoints and in baggage screening areas by TSOs and LTSOs performing only security screening activities."  Id.  Akal proposed [* * *] screening hours.  Id.  The SAM contemplated 587,246 screening hours, a difference of only [* * *] percent, and thus the Government found Akal's proposed screening hours was not unreasonably low.  Id.  As compared to FirstLine's actual number of screening hours at MCI, TET found Akal's proposal contained only [* * *] percent fewer hours than FirstLine's actual hours for the 2013 calendar year.  AR 2319.

Lastly, in addressing Akal's use of temporary promotions, the SSA found no risk and no violation of the SOPs.  AR Tab 41 at 2307.  The TET noted the SOPs "specifically allows for the LTSO to perform the duties of [an] STSO."  AR 2307.  Accordingly, in such circumstances, an LTSO who is "temporarily promoted to an acting STSO" is still officially an LTSO.  Id.

The parties filed briefs on TSA's new findings and the Court heard oral argument on September 24, 2014.  The case is now ready for decision.

---

[5] [* * *]

<u>Discussion</u>

I.     <u>Jurisdiction</u>

Under the Tucker Act, this Court has jurisdiction to render judgment on "an action by an interested party objecting to . . . the award of a contract." 28 U.S.C. § 1491(b)(1). An interested party under Section 1491(b)(1) is (a) "an actual or prospective bidder" and (b) "possess[es] the requisite direct economic interest." <u>Sys. Application & Techs. v. United States</u>, 691 F.3d 1374, 1382 (Fed. Cir. 2012) (internal citations omitted). In post-award bid protests, this standard is met when the plaintiff shows it had a "substantial chance" of receiving the contract. See <u>id.</u>

There is no dispute here that FirstLine as the incumbent contractor, and the next-in-line offeror to receive the MCI contract, has standing as an interested party to challenge the award to Akal. <u>See</u> AR Tab 19 at 1602; AR Tab 41 at 2300. TSA rated FirstLine and Akal "technically equal" and the only difference between the proposals was price. AR Tab 19 at 1520; AR Tab 20 at 1616. Without the procurement errors alleged by FirstLine, TSA would likely have awarded the contract to Plaintiff given that the agency rated FirstLine as the next best proposal. AR Tab 20 at 1615 ("[t]he top two rated technical proposals are Akal and FirstLine"). Further, none of the parties challenged FirstLine's standing to bring a claim in this Court. FirstLine is an interested party and has standing to bring this protest under Section 1491.

II.     <u>Standard of Review in Bid Protests</u>

Bid protests are reviewed by the Court under the standards set forth in the Administrative Procedures Act ("APA"). 5 U.S.C. § 706. Under the APA, agency action shall be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." <u>Id.</u> The Court reviews a bid protest in two steps. <u>See</u> <u>Bannum, Inc. v. United States</u>, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the Court determines whether "the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract." <u>Id.</u> at 1351, 1354 (noting the "arbitrary and capricious" standard of review "goes to the agency's compliance with the law"). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." <u>Metropolitan Van & Storage, Inc. v. United States</u>, 92 Fed. Cl. 232, 246 (2010) (quoting <u>Honeywell, Inc. v. United States</u>, 870 F.2d 644, 648 (Fed. Cir. 1989)). An agency decision lacks a rational basis, however, if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision was] so implausible that it could not be ascribed to a

11

difference in view or the product of agency expertise." Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). The inquiry at this first step is highly deferential and *de minimis* errors in the procurement award process do not justify relief. Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 1000 (Fed. Cir. 1996); Andersen Consulting v. United States, 959 F.2d 929, 932-33, 935 (Fed. Cir. 1992).

The discretion afforded contracting officials extends to "the determination of what constitutes an advantage over other proposals." FCN, Inc. v. United States, 115 Fed. Cl. 335, 363 (2014). In some circumstances, contracting officers are afforded greater discretion than in others, such as with negotiated procurements. See id. Contracting officers have even more discretion when they are awarding contracts made on a best value determination as compared to price alone. See Croman Corp. v. United States, 724 F.3d 1357, 1363 (Fed. Cir. 2013) (citing Banknote Corp. v. United States, 365 F.3d 1345, 1355 (Fed. Cir. 2004)). The greatest possible deference is given by the Court to evaluation of proposals for their technical excellence or quality. See Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 243 (2011). Courts will not second guess an agency's determinations on matters that concern the minutiae of the procurement process such as technical ratings. See id. As the contracting officer's discretion grows, so too does the burden on the protestor to show that the agency action was arbitrary and capricious. See FCN, 115 Fed. Cl. at 364.

If the Court finds that the agency acted without a rational basis or contrary to law, then the second step is to determine whether the protestor was prejudiced by the agency's conduct. See Bannum, 404 F.3d at 1353. When making a prejudice analysis in the first instance, the Court "is required to make factual findings under Rule [52.1] of the Rules of the United States Court of Federal Claims ("RCFC") from the record evidence as if it were conducting a trial on the record." Id. at 1357. Prejudice is established when a protestor establishes that but for an error in the procurement process, there is a substantial chance that the protestor would have received the award. See id. at 1353, 1358.

III.   Standard of Review for Judgment on the Administrative Record and for Injunctive Relief

Under RCFC 52.1(c), when a party moves for judgment on the administrative record, the "existence of genuine issues of material fact does not preclude judgment on the administrative record." Tech Sys., 98 Fed. Cl. at 242-43. Rather, the Court must determine "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013) (citing Bannum, 404 F.3d at 1356-57).

12

Judgment on the administrative record is intended to provide "for an expedited trial on the record." Bannum, 404 F.3d at 1356. Thus, "the focal point for judicial review should be the administrative record already in existence, not some record made initially in the reviewing court." Florida Power & Light v. Lorion, 470 U.S. 729, 743 (1985) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). Supplementation of the administrative record may be granted, however, where "the omission of extra-record evidence precludes effective judicial review." Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1380 (Fed. Cir. 2009).

In assessing whether plaintiff is entitled to permanent injunctive relief, four factors are considered: (1) whether the plaintiff has succeeded on the merits; (2) whether the plaintiff will suffer irreparable harm if the court withholds relief; (3) whether the balance of hardships to the respective parties favors granting injunctive relief; and (4) whether the public interest is served in granting injunctive relief. Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009). Success on the merits is the most important factor but no single factor is dispositive. See Blue & Gold Fleet L.P. v. United States, 492 F.3d 1308, 1312 (Fed. Cir. 2007); FMC Corp. v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). "Finally, because injunctive relief is relatively drastic in nature, a plaintiff must demonstrate that its right to such relief is clear." CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 368-69 (2010) (quoting NEQ, LLC v. United States, 88 Fed. Cl. 38, 47 (2009)).

IV.   Analysis of the Merits

In this protest, FirstLine contends that TSA's best value determination and award of the MCI contract to Akal was irrational due to the agency's failure to evaluate five major risks associated with Akal's proposal. See Pl.'s Remand MJAR at 2. Plaintiff also asserts that TSA's response to the Remand Order did not cure the defects in the agency's pre-remand evaluation and award decision and thus, FirstLine is entitled to injunctive relief. See id. at 4.

FirstLine has raised five specific challenges to TSA's evaluation of the proposals for the MCI contract: (1) the low number of screening hours proposed by Akal; (2) Akal's [* * *] percent employee retention plan; (3) Akal's [* * *] percent award fee; (4) whether Akal meets the proposed performance requirements in the solicitation, the SOPs, and the ATSA; and (5) the identical technical ratings of the offerors. FirstLine claims these were five major risks not evaluated during TSA's award decision and were not cured by the agency's response to the Remand Order. Plaintiff's and Defendant's arguments on each of these five challenges are analyzed below, along with the Court's resolution of these issues.

A.     Number of Screening Hours Proposed

FirstLine's primary issue with TSA's award decision is the agency's evaluation of Akal's low proposed screening hours.  Specifically, FirstLine argues that the SSA and the three evaluation teams acted irrationally by not conducting a risk assessment of Akal's proposed number of screening hours.  See Jackson Decl. ¶¶ 30-32 (proposing [* * *] percent fewer screening hours than FirstLine).  FirstLine states that there is a risk of significant increase to the cost of the contract if Akal's actual number of screening hours exceeds the amount proposed.  Id.  According to FirstLine, Akal, in its proposal, "understaffed the screening hours of higher-paid senior screeners by [* * *] hours."  Pl.'s Remand MJAR at 23.  Akal proposed [* * *] percent fewer screening hours for the LTSO positions and [* * *] percent fewer screening hours for the STSO positions as compared to FirstLine's historical data.  Id. at 28.  FirstLine argues that screening hours are the "heart of the [c]ontract" and TSA's continued reliance on productive hours is irrational and ignores this Court's remand order.  Id. at 24.

In response to FirstLine, the Government relies first on its productive hours estimate, explaining that the total number of productive hours is important "to accurately evaluate whether Akal's proposed hours present risk to contract performance."  Def.'s Mot. for J. on the Remand Admin. R. at 24, Dkt. No. 95 ("Def.'s Remand MJAR").  The Government argues that productive hours measure all the services a contractor must perform, not just screening services, and that this evaluation constitutes sufficient risk analysis as TSA must evaluate proposals according to the solicitation.  Id.  The solicitation only required TSA to conduct a productive hours analysis.  Id.; AR Tab 2 at 257.  According to Defendant, FirstLine alleged no error with TSA's analysis of Akal's proposed productive hours and thus the Court should "grant the United States judgment upon the remand administrative record."  Def.'s Reply in Support of its Cross-Mot. for J. on Remand Admin. R. at 12-13, Dkt. No. 104 ("Def.'s Remand Reply").

Looking only at screening hours, the Government asserts that TSA had a rational basis for finding Akal's proposed number of screening hours reasonable.  Def.'s Remand MJAR at 27.  First, the number of screening hours was only [* * *] percent less than the SAM's estimate.  Id.  Second, nothing prohibited TSA from comparing the proposals to a Government estimate rather than to FirstLine's historical data.  Id. at 29.  By relying on historical data, FirstLine is asking the Court to second guess the agency's discretionary determinations, which it cannot do.  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996).  Finally, not all work performed by STSOs is strictly screening work and thus, TSA could conclude that the number of screening hours proposed by Akal for the STSO position was sufficient.  Def.'s Remand MJAR at 28; AR Tab 25 at 1678 ("[t]he STSO must not routinely conduct EDS screening, x-ray screening, LCS, travel document checking, operate an ETD, load bags on the x-ray system conveyor, physically

14

inspect accessible property or checked baggage"); AR Tab 42 at 2314 (defining screening hours).

The Government is incorrect when it claims that a review of TSA's risk analysis of productive hours is sufficient to determine the reasonableness of its award. The Government's reliance on productive hours ignores the Court's remand order which specifically asked the agency to evaluate the risk to contract performance with Akal's proposed number of screening hours. Remand Order at 3. Furthermore, the solicitation itself required offerors to submit a breakdown of the total number of screening and non-screening hours proposed for each position. AR Tab 1 at 203 (J.16 Staffing Plan). It did not require offerors to submit only their proposed number of productive hours. AR Tab 2 at 269 ("[t]he Contractor *shall* use the template located in Attachment J.16 Staffing Plan Template").

However, TSA evaluated the risk of Akal's low proposed screening hours to contract performance on remand and again found no risk. AR Tab 41 at 2304-06. The agency compared Akal's proposed screening hours to the SAM and concluded that Akal's proposed number of screening hours was not unreasonably low. AR Tab 42 at 2314 (total screening hours was only [* * *] percent less than the Government's estimate). Therefore, the Court finds the agency's risk assessment of Akal's proposed screening hours had a rational basis and is supported by the administrative record. Compared to the Government's estimate, there was only a marginal difference between the SAM and Akal's proposed screening hours. AR 2314. The SAM estimated 587,246 screening hours and Akal proposed [* * *] hours. Id. (only a difference of [* * *] percent).

FirstLine goes further in its argument regarding TSA's analysis of screening and non-screening hours on remand, contending that, in order to perform a rational risk analysis, more than just the total number of screening hours or productive hours must be evaluated. The J.16 Staffing Plan required offerors to submit proposed hours for each labor category: TSOs, LTSOs, and STSOs, AR Tab 1 at 203, and FirstLine states that TSA's risk analysis relied upon a defective SAM estimate, which "[hid] from the Court the screening hours for the labor categories in which Akal was most deficient," Pl.'s Remand MJAR at 26. According to Plaintiff, the number of LTSO and STSO hours should have been evaluated individually to determine whether such hours were unreasonably low. Pl.'s Sealed Response and Reply at 2, Dkt. No. 98 ("Pl.'s Remand Reply"). Plaintiff argues that Akal's low proposed screening hours for the LTSO and STSO positions creates significant risk to contract performance because otherwise, Akal would either have to violate the SOPs to make up the difference in hours, or bill the Government for the additional hours. Pl.'s Remand MJAR at 26-27. Thus, Plaintiff contends that it violated the solicitation for TSA to ignore the breakdown of LTSO and

STSO screening hours in the J.16 Staffing Plan when the agency evaluated each proposal. Pl.'s Remand Reply at 7-8; AR Tab 1 at 203 (the J.16 Staffing Plan breaks down the number of screening hours and non-screening hours by position).

The Court concludes that TSA did not err in its evaluation of Akal's proposed LTSO and STSO screening hours.  As specified in the SOPs, the primary duties of an STSO are not screening services that TSOs or LTSOs typically perform.  AR Tab 25 at 1678 ("STSOs are strongly encouraged to perform TSO duties on a limited basis in order to maintain their screening skills and currency").[6]  TSA also fully considered the risk to contract performance with the number of LTSO and STSO hours Akal offered, stating "under [Akal's] approach, during non-peak operations there will be fewer TSOs resulting in reducing excessive supervisor presence." AR Tab 41 at 2305.  The agency reasonably concluded that Akal's flexible approach would reduce the need for "more expensive STSO and LTSO oversight."  Id.  Based upon the rationales provided by the agency and the broad discretion afforded contracting officials in making best value determinations, the Court cannot say that TSA's decision lacked a rational basis.  The agency provided a "coherent and reasonable explanation of its exercise of discretion," Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001), which is supported by the administrative record.

B.    Akal's [* * *] Percent Employee Retention Plan

FirstLine next claims that Akal's proposed employee retention plan is a major risk to contract performance and that TSA did not properly evaluate this risk before or after remand.  According to Plaintiff, Akal will not be able to retain [* * *] percent of the existing workforce, because it proposed compensation packages to employees worth less than what FirstLine currently offers to its screeners.  Pl.'s Remand MJAR at 18.  They argue that wage and hour cuts "materially impact morale and retention," and it is patently irrational to conclude that these cuts can be mitigated by the strategies Akal proposed. Id. at 18-19 ("[t]he SSA does not and cannot explain how a 'flexible compensation package' will mitigate the [* * *] loss in wages").  Even assuming Akal could achieve a [* * *] percent employee retention rate, it would still have to hire at least [* * *] new screeners.  Pl.'s Remand MJAR at 19; Jackson Decl. ¶¶ 30-32.  Finally, if Akal cannot achieve its "unrealistically rosy" retention rate, many more screeners will need to be hired.  Pl.'s Remand MJAR at 20-22.

---

[6] TSO duties include the following screening functions: (1) x-ray screening of accessible property; (2) WTMD screening of individuals; (3) AIT screening of individuals; (4) travel document checkers (TDC); (5) divestiture officer; (6) unpredictable screening process; (7) additional screening of individuals; (8) additional screening of accessible property; (9) exit lane monitor; (10) EDS screening of checked baggage; (11) ETD screening of checked baggage; and (12) additional screening of checked baggage.  AR Tab 25 at 1676.

In response, the Government argues that the SSA could rationally find that the flexible compensation package was a creative way to mitigate risk.  This package would allow Akal "to meet the various, individual needs of each employee."  Def.'s Remand MJAR at 21.  It is also speculative whether Akal would or would not be able to achieve its proposed [* * *] percent employee retention rate.  Id.; Def.'s Remand Reply at 8-9.  Finally, consideration of other contractors' employee retention rates at other SPP airports provides reasonable support for Akal's employee retention rate goal.  Def.'s Remand MJAR at 21.  Defendant states that TSA rationally evaluated the risk of Akal's proposed retention rate to contract performance, and that its decision should be given deference as it is supported by the administrative record and is "well within the substantial discretion of the contracting officials."  Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 908 (Fed. Cir. 2013).

On remand, the SSA examined Akal's proposed employee retention rate and was again satisfied that Akal's mitigation strategies would provide a "low or no risk solution in the [* * *] percent [employee] retention proposed, when combined with a planned recruiting effort that includes hiring rallies for existing employees, multiple recruitment efforts for new hires, and a plan to make any employee in the existing hiring pool a priority."  AR Tab 41 at 2302.  Based upon review of the administrative record, including the agency's analysis following the remand order, the Court cannot say TSA's evaluation was irrational.  Akal's employee incentive program and the employee retention rates at other SPP airports support the agency's conclusion that the [* * *] percent employee retention rate was not unreasonably high and did not pose a risk to contract performance.

While it may be difficult for FirstLine to see how two different offerors, one with twelve years of experience and one with zero, could receive identical ratings on Factor 2: Screening Management and Factor 5: Transition, the solicitation did not ask the contracting officials to compare offerors when conducting their assessment of the initial proposals and the FRPs.  TSA only had to consider whether Akal's proposed retention rate posed an unacceptable risk to contract performance.  TSA found it did not and fully documented its reasoning in the administrative record.  Tab 41 at 2302 (finding under Factor 2: Screening Management and Factor 5: Transition Akal to be "highly rated for their demonstrated detail and comprehension of the screening and hiring environment, with risk addressed by Akal in its risk mitigation strategy").  This is not a situation where TSA "entirely failed to evaluate some aspect of the proposal" or conducted an evaluation outside of the terms of the solicitation.  Ala. Aircraft Indus., 586 F.3d at 1375.  Rather, the administrative record demonstrates that TSA considered all the aspects surrounding Akal's proposed retention rate and still found no risk.  The Court cannot find that this conclusion was an error or lacked a rational basis.

17

C.      Akal's [* * *] Percent Award Fee

Plaintiff's third challenge is to Akal's proposed [* * *] percent award fee. FirstLine argues that the [* * *] percent award fee presents an unacceptable and major contract risk and it was "arbitrary and capricious" to award Akal the MCI contract with such a low award fee.  Pl.'s Remand MJAR at 14 (claiming "[a]ny reasonable person would agree that a contractor that has a [* * *] award fee at stake has more motivation to provide exceptional service than does an offeror with a [* * *] award fee").  FirstLine does not believe it is possible for Akal's employee incentive program to mitigate the impact on morale or to motivate Akal to provide superior service.  Id. at 14-15.

In the Government's view, however, Plaintiff's disagreements with TSA's risk assessment of Akal's proposed award fee do not point to procurement errors.  The better Akal's employees perform on various metrics such as x-ray screening, the better Akal will perform the contract requirements.  See Def.'s Remand Reply at 9-10 ("increased understanding of the x-ray machine[s] will increase his or her efficiency and accuracy when x-raying bags, thus improving metrics such as passenger wait time and SOPs compliance").  Efficient performance by employees means fewer hours will need to be devoted to screening.  Def.'s Remand MJAR at 18.  By devoting additional hours to training to make employees more proficient at their jobs, the screening process will move faster without causing unnecessary risk to the traveling public.  Id.  Thus, "it was not arbitrary or capricious for TSA to determine that Akal's incentivizing of its employees will encourage superior performance on the contract" despite the low award fee.  Id. Offerors were free to choose an award fee they thought would allow them to achieve the contract requirements and the award fee was one of the factors for a competitive award. AR Tab 3 at 282 (explaining "[i]t is the business decision of each offeror to determine the appropriate award fee percentage within that competitive context").

TSA offered a sufficient explanation why Akal could be incentivized to offer superior performance despite a lower than average award fee.  First, TSA found that the employee incentive program properly mitigated the risk to contract performance because it would create a more motivated workforce and increase employees' performance.  AR Tab 41 at 2301.  Second, it was within the offeror's discretion to propose a competitive award fee.  Id.  The competitive nature of this procurement impacted the award fee and likely lowered offerors' prices.  Id.

These rationales satisfy the Court that TSA properly evaluated the risk to contract performance and did not lack a rational basis for its evaluation of the offerors' proposals. While the award fee is low, TSA's finding of no risk to contract performance has a reasonable basis, Metropolitan Van & Storage, 92 Fed. Cl. at 246, that is supported by the administrative record.  A low award fee does not necessarily mean the offeror will

18

provide poor performance under the contract if other aspects of the proposal are sufficient to motivate the contractor.  TSA found there was sufficient incentive for Akal to provide superior contract performance based on other aspects of Akal's proposal such as the employee incentive program.   This analysis was rational.   Thus, there was no procurement error with TSA's evaluation of Akal's proposed award fee, and there is no basis for the Court to overturn the award to Akal.

### D.   Performance Requirements in the Solicitation, the SOPs, and the ATSA

Another area of concern addressed on remand was whether Akal's proposed use of temporary promotions met the performance requirements in the solicitation, as Akal did not review the SOPs while preparing its proposal.  Remand Order at 3; AR Tab 41 at 2307.  Prior to the remand evaluation, FirstLine argued that Akal violated the SOPs with its temporary promotions plan.  Pl.'s Mem. in Supp. Mot. for J. on the Admin. R. at 23-27, Dkt. No. 50-1.  Thus, the Court asked TSA on remand to determine whether Akal violated the SOPs.  Remand Order at 3.  TSA determined that Akal did not.  AR Tab 41 at 2307.

Following the remand evaluation, FirstLine continues to argue that TSA erred by finding Akal's proposed use of temporary promotions to be in compliance with the SOPs. Plaintiff admits that its argument is contingent upon the Court finding Akal's number of STSO screening hours unacceptably low.  Pl.'s Remand MJAR at 36 (explaining "if Akal's proposed STSO screening hours are nominally in line with the government estimate, then one can reasonably conclude that its temporary promotions approach is consistent with the SOPs").  This means that if the Court finds TSA acted irrationally by not considering Akal's proposed STSO screening hours or finds "Akal's STSO screening hours significantly lower than the [G]overnment estimate," then it must also conclude that Akal's use of temporary promotions violates the SOPs.  Id.  FirstLine maintains that temporary promotions violate the SOPs because such promotions are only to be used, for example, when an STSO goes on a bathroom or lunch break.  The temporary promotions procedure is not designed to fill gaps during peak periods.  Pl.'s Remand Reply at 24; AR Tab 25 at 1678.

In response, the Government contends that FirstLine has not identified any procurement error or violation of law with Akal's proposed temporary promotions model. Def.'s Remand MJAR at 32.  Rather, Plaintiff's argument is based upon speculation that Akal will violate the law through use of improper temporary promotions.  Id. at 32-33. However, there is no evidence that Akal will violate the SOPs because "FirstLine's staffing solution is not the minimum amount of hours necessary to perform the contract." Id. at 33.   Other proposals could comply with the solicitation, even proposals that included fewer screening hours than FirstLine.  Id.  Lastly, according to the Government,

if TSA acted rationally by finding that Akal's proposed STSO screening hours were not unreasonably low, then the Court must find Akal's use of temporary promotions comports with the SOPs.  Def.'s Remand Reply at 19.

Here, FirstLine's argument fails for two reasons.  First, Plaintiff did not meet its burden to show that TSA acted irrationally by finding no risk with Akal's proposed number of STSO and LTSO screening hours.  Thus, there was no error with Akal's decision to use temporary promotions to staff screening lanes during peak periods. Second, the Court finds that even if FirstLine could show that the agency lacked a rational basis for finding that Akal's proposed STSO hours presented an unnecessary risk to contract performance, temporary promotions do not necessarily violate the SOPs. Under the SOPs, Federal Security Directors ("FSDs") "may designate and schedule LTSOs to act as STSOs if temporary operational requirements cannot accommodate assignment of an STSO to each shift."  AR Tab 25 at 1678.  Akal's proposal met the requirements of the solicitation, the SOPs, and the ATSA.

### E.   The Identical Technical Ratings of FirstLine and Akal

Finally, Plaintiff argues that TSA's identical ratings of FirstLine and Akal on the non-price evaluation factors is patently irrational.  According to FirstLine, TSA cannot provide any justification explaining how one offeror who has never performed an SPP contract can receive identical ratings to an offeror who has performed the MCI contract flawlessly for twelve years.  Pl.'s Remand MJAR at 9.  Primarily, FirstLine takes issue with TSA's evaluation of Factor 5 (Transition) because FirstLine will not need to undergo any transition activities, whereas Akal must undergo extensive transition activities because it has never performed the services being procured.  Id.

In response, the Government contends that FirstLine did not identify any procurement error with TSA's technical evaluation ratings.  First, there is "no procurement law, regulation or precedent [that] requires . . . an agency assign an incumbent offeror higher evaluation ratings than its competitors."  Def.'s Remand MJAR at 15.  Second, the solicitation did not require TSA to rate FirstLine higher than its competitors.  Id.  Third, if FirstLine had an issue with the past performance evaluation factor, then it should have brought that challenge during its pre-award protest at this Court.  Id. at 16; FirstLine II, 107 Fed. Cl. at 193 (noting FirstLine narrowed its protest to two arguments: the small business participation goal and the amount of information TSA provided to allow offerors to compete on an intelligent and relatively equal basis). Fourth, TSA evaluated each proposal independently and offered sufficient justification for FirstLine's and Akal's identical evaluation ratings.  Def.'s Remand MJAR at 15-16 (noting each proposal was evaluated on its own merits); AR Tab 41 at 2300.  Finally, FirstLine misunderstood the solicitation, which called for innovative approaches to

20

airport security screening.  Def.'s Remand MJAR at 17.  Just because Akal's proposal was different from FirstLine's does not mean that it is inherently risky or that it is an area of service where innovation is not required.  Id.

Here, the administrative record supports TSA's conclusion that Akal's proposal was "technically equivalent" to FirstLine's proposal.  Incumbency was only one advantage – but an offeror could overcome that advantage by proposing an innovative solution, which according to TSA, Akal did.  TSA fully evaluated past performance and considered FirstLine's incumbency accordingly.  AR Tab 19 at 1536 (noting both FirstLine and Akal "have a history of providing relevant and good quality services in the areas described in the solicitation in an environment of similar size, scope, and/or complexity").  TSA also cited to a number of "strengths" they found in Akal's proposal, such as the Queue Management System and the flexibility provided by having more part-time screeners.  AR Tab 42 at 2312-13.  TSA properly credited these aspects of the proposal as innovative solutions for providing security at SPP airports such as MCI, and as reasons why Akal received identical ratings to FirstLine on the non-price evaluation factors.  AR Tab 41 at 2300.  TSA's award decision was reasonable.  It is not the Court's role to second-guess the ratings given by TSA so long as the agency provided some rational explanation supported by the administrative record.  See, e.g., E.W. Bliss, 77 F.3d at 449.  The agency's award decision to Akal for the MCI contract must stand.

## Conclusion

For the reasons explained above, the Court GRANTS the Government's motion for judgment on the administrative record, GRANTS the Intervenor's motion for judgment on the administrative record, and DENIES Plaintiff's cross-motion on the same, as well as its separate motion for injunctive relief.

This decision is filed under seal.  On or before November 20, 2014, counsel for the parties shall carefully review this opinion for competition-sensitive, proprietary, confidential or other protected information and submit to the Court any proposed redactions to this opinion, if any, before it is released for publication.  The parties are requested to minimize their requested redactions so that the Court may publish as much of the decision as possible.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge